ARIADNE, The, (UNITED STATES v.) See Case No. 14,465.

## Case No. 527.

### The ARIEL.

### [1 Hask. 65.] [1]

District Court, D. Maine. Feb., 1867.

CUSTOMS DUTIES—PROPERTY SUBJECT TO —DOMESTIC GOODS SHIPPED FROM FOREIGN PORT TO AID IN CONCEALING FOREIGN GOODS — MANIFEST — ADMIRALTY—GOODS SEIZED ON LAND.

1. Goods shipped from one domestic port to another, and on the voyage taken to a foreign port with the design and purpose to disguise the character of the vessel. and conceal foreign goods there taken on board to be smuggled, become incorporated into, and a part of an entire cargo to be imported from thence.

2. Goods seized on land are not subject to condemnation and forfeiture in admiralty.

3. A claimant. who has voluntarily destroyed the ship's manifest to prevent its being used as evidence, cannot prove its contents by secondary evidence.

4. A sufficient manifest must state, first by whom the goods are shipped. second, if part of the cargo is brought back, by whom shipped out, and to whom consigned inward.

5. For want thereof, goods, belonging to one of the officers or crew of a vessel belonging in whole or in part to an American citizen. are liable to forfeiture under section 24 of the act of 1799, [1 Stat. 646.]

6. If a manifest is not produced to the proper officers, or its nonproduction accounted for to the satisfaction of the court, a forfeiture attaches to the goods imported.

7. An attempt to import merchandise from a foreign port as coming directly from a do-

[1][Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

mestic port is fraudulent, and subjects the same to forfeiture.

In admiralty. Libel in rem by the United States against the schooner Ariel and cargo, claiming a forfeiture of both for violation of the revenue laws. For the vessel and a part of the cargo no claim was made; but the balance of the cargo was claimed as goods brought from a domestic port and not subject to duty.

Geo. F. Talbot, Dist. Atty., for the United States.

Almon A. Strout and Geo. F. Shepley, for claimant.

FOX, District Judge. The Ariel is a registered vessel of about 23 tons. She sailed from Portland about the 11th of July last with only one person on board, her owner, Francis Raymond. Her cargo consisted of 25 hogsheads of salt, which had been taken on board the previous voyage at Portland, and remained on board until it was disposed of by Raymond on the present voyage at Mt. Desert. This salt was the property of Thomas G. Young. Having disposed of the salt, Raymond proceeded in the vessel to Calais, where he found Young, who had purchased there 25 M. of lathes, which he put on board the schooner. Young and Raymond then proceeded in the schooner to Eastport, where Young purchased about 100 quintals dry fish, 1200 boxes herring, and 16 barrels cod-liver-oil. Young states, these articles were purchased by him on speculation, and were put on board the Ariel, consigned to Dana & Co., Portland. that the vessel was cleared from Eastport for Portland. these articles being entered on a manifest as shipped by him to Dana & Co.. and that at the time they sailed from Eastport, he did not know that Raymond had any intention of going into Campo Bello. The Ariel with Young and Raymond, the only persons on board, sailed from Eastport Aug. 15th. and the same night went into Head harbor, which is in the island of Campo Bello, and British territory, and there received on board from the British schooner. Frank, 8 hogsheads of alcohol, 75 packages of gin and brandy, 2 casks of brandy, 1 cask of gin, and 8 packages of spices, one J. D. Carlisle being there and aiding in the business, having come there in the Frank. The Ariel remained in Head harbor three days, and then sailed for Portland with Young still on board, Raymond acting as master. She arrived in Casco bay off Mackie's island in the night, and landed Young, and then stood out to sea. She was hovering about the islands in the bay, standing off in the day time, and running in at night to communicate with Young, and whilst so employed, she got ashore on Birch island and filled with water. A portion of her cargo was landed, she was then got off, and the next day was seized by the revenue cutter Mahoning near Cow island.

and within the limits of Portland. Whilst the vessel was ashore, Young returned to her and assisted in saving the cargo. The vessel and cargo were libelled, and upon proclamation, no person appearing as claimant, she was condemned with all the property taken on board of her at Head harbor; but Young has appeared and filed a claim as owner of the lathes, fish, oil and herring, denying their liability to forfeiture, and the controversy is now confined to these articles.

This claimant is shown to be an experienced ship-master; he denies all connection or interest in the illicit undertakings of this vessel, and asserts that he did not know or expect that she would go into Head harbor; he also denies any interest in the property there taken on board. It is certainly the duty of the court not lightly to suspect the truth of statements clothed with the solemn sanctions of an oath, but testimony however positive must in its nature be liable to control by strong presumptive circumstances, and must be weighed with care when it comes loaded with the temptations of private interests and the impressions of personal penalties. It is a melancholy consideration for judges, that in the discharge of public duty, they often find themselves obliged to resist the influence of human declarations, and to rely upon the concurrence of probable circumstances. There is evidence before me, full and uncontradicted, that this same vessel with Young and Raymond on board, in May last went from Portland to Eastport with this same 25 hogsheads of salt, and a quantity of pottery belonging to Young, that Young then bought some cord-wood, put it on board the schooner, that they then sailed to Head harbor, where they met this same schooner Frank with Carlisle, and took from her on board the Ariel a large quantity of alcohol, spices and foreign liquors, all of which were successfully smuggled ashore at Falmouth the latter part of June, Young and Carlisle both aiding in the work. Young was interested in that expedition, served as a hand on board the schooner throughout the voyage, purchased at Eastport the cord-wood for a deck-load, in order, as I suspect, to deceive any revenue boats they might meet, and I cannot but believe that his purchases at Calais and Eastport on this present voyage were for the same object and purpose, to conceal the foreign goods on board, and hold out to any casual observer that the Ariel was a coaster, with her deck-load of lathes, etc., engaged in an honest, legitimate business.

Young joins this schooner again at Calais, acts as one of the crew of this vessel then about 30 years old, and of so little value that Young himself states under oath, he would hardly take the gift of her, and if Raymond is to be believed, he assisted in receiving the liquors on board at Head harbor from the Frank, and continues on board, until they again arrive off Mackie's island, as Raymond swears, where he landed Young in the night

time, as he did on the former expedition. Young, however, denies that he was landed on that island, but says he was put ashore on the east end of Long island, and that his reason for going ashore at that place was, that he wished to purchase of a person on Haskell's island, a quantity of oil and fish. If such was his object, it is quite extraordinary that he should have pursued just the course he did, as Long island is 12 or 15 miles to the westward of Haskell's island, and the Ariel on her passage up, passed quite near to Haskell's island, so that Young could have easily been set ashore from the Ariel upon the island, if he wished to land there, instead of being carried a dozen miles away from it to the westward. I am inclined to believe, Young did land on Mackie's island, and there met his accomplices, and finding perhaps, that the suspicions of the government officers had been excited, and that they were on the watch, it became necessary to seek out some other place of landing, and he therefore returned to the vessel, and was set ashore at Long island for that object. If everything had been fair, legitimate and honest on Young's part, he would not have allowed this vessel to be dodging around the islands with his property at risk, but having arrived so near to her port of destination, he would have required the master to finish his cruise and enter the cargo, which could easily have been done by inserting in the manifest, if correct and according to law, all the goods and merchandise received on board at Head harbor. All the circumstances of the case satisfy me that Young was a participator, interested in this smuggling expedition, and that I am not justified in placing implicit confidence in his testimony; and upon this point his actions and conduct upon the previous voyage of this vessel have, in my view, an important bearing, and are clearly admissible. I find therefore, as a matter of fact in this case, that these articles claimed by Young, although products of the United States, were purchased by the claimant at Calais and Eastport, not for legitimate trade and commerce, but with the design of taking them to a foreign territory in this schooner, there to be used in aid of a smuggling voyage to this port; that they were not taken there for a lawful purpose, but on the contrary, the design was they should be used there and on the homeward trip in concealing the real purposes of the voyage and the foreign goods on board, and in so disguising the cargo and the general appearance of the vessel, that she would not be likely to be overhauled by revenue boats during the voyage. From the time the foreign goods were taken on board at Head harbor, the goods in question became incorporated with them, constituting in the whole but one cargo, which under all the circumstances of the case, I deem it my duty to consider exactly as if it had all been there shipped on board the Ariel, and had been brought and import-

ed from thence into this port; for there can be no doubt that they were all brought in this schooner within the limits of the port of Portland and Falmouth voluntarily by the master, and with the design of here landing them.

This proceeding is on the admiralty side of the court, and the libel alleges in the first count that these goods are forfeited, being seized on navigable waters, etc., because they were landed without a permit and not in open day; but the fact is, that although some of the goods were thus landed, none of the goods so landed were ever restored to the Ariel, but were seized on land by the government officers, and although landed in violation of the statute, yet having been seized on land, they are not subject to condemnation and forfeiture in the admiralty. Of course the goods which had never been landed, but had always remained on board the Ariel, cannot be condemned under this count in the libel. The second count charges an importation of these goods from a foreign place by the Ariel without having a manifest or manifests on board agreeably to the requirements of the statute. It is necessary, therefore, to examine carefully all the evidence relating to the manifest, and ascertain whether the provisions of the statute have in any respect been violated

Young says "The articles in question were entered on the manifest in his name, consigned to the Dana's in Portland, that he and Raymond went to the custom house in Eastport, and he thinks he saw the name of the collector of Eastport upon the manifest." Raymond in his deposition states "The lathes, fish, herring and oil, were on the manifest. The vessel cleared from Eastport for Portland. They were by a written memorandum from Young to me put upon the manifest in the name of J. D. Carlisle. At the time the schooner was taken, there was in a tin box in my trunk on board of her, her register, a bill of sale from Barton, a manifest and some other papers. The last time I saw them was on Sunday before I got on the ledge, have not seen them since, and don't know what has become of them." On cross examination he again repeats that these articles were on the manifest, and in reply to the inquiry, "what did you do with the manifest," he says, "I cannot tell you. I lost it certainly. I had my papers in a tin box on Sunday, the day I got on the ledge. Since that I don't know what has become of them." Young says he has no doubt Raymond threw the manifests overboard, for he heard him say he should do so if chased by a cutter. Raymond claims there was a manifest on board when the schooner was seized; but this is denied by the officers of the cutter. None has ever been produced, and on the whole, I am inclined to believe Raymond told Young what Young says he did, and that when chased by the cutter, he did destroy it by throwing it overboard. In his deposition he

nowhere expressly denies that he did so, and as he does not pretend that the liquors were entered upon any manifest, he would be quite likely to take that course, if the occasion should arise.

The act of 1799, c. 22, § 23, [1 Stat. 644,] declares, that no goods, wares or merchandise shall be brought into the United States from any foreign port or place, in any ship or vessel belonging in whole or in part to a citizen, unless the master or person having charge, etc., shall have on board a manifest or manifests in writing, signed by such master or other person, containing the name of the port where the goods in such manifest mentioned shall have been taken on board, and the port for which they are consigned or destined, particularly noting the goods, wares and merchandise destined for each port, and the name, description and build of such ship or vessel, her true admeasurements; and the port to which she belongs, with the name of each owner according to the register, together with the name of the master or other person in charge, a just and particular account of all the goods, wares and merchandise so laden and taken on board, whether in packages or stowed loose, together with the marks and numbers as marked on each package, and the number, quantity and description of the packages, in words at length, together with the names of the persons to whom the same are respectively consigned agreeably to the bill of lading, signed for the same, unless when the said goods are consigned to order, when it shall be so expressed in said manifest, together with names of passengers and their baggage; and that the form of a manifest for goods and merchandise imported in a vessel of the United States, shall be as specified in the statutes. If any articles of the outward cargo are brought back, they are to be detailed, specifying by whom shipped outward and to whom consigned inward. It thus appears that the statute explicitly declares what the manifests shall contain to give it validity; it makes all these particulars requisite; they must each and all be found in the manifest to protect the property on board; all these matters as to the vessel, the voyage and her ownership, the ownership of the goods, the consignee, etc., the statute requires should be recited in the manifest. Is there sufficient legal evidence before the court, that such a manifest of these goods was ever on board the Ariel? Is secondary evidence of the character and contents of a manifest voluntarily destroyed by the master admissible? Under such circumstances, is the claimant at liberty to prove by parol, that there was on board a valid statute manifest? A party, who under no pretense of mistake or accident, voluntarily destroys primary evidence to prevent its being used against him, or for other fraudulent purposes, thereby excludes himself from the benefit of secondary evidence.

Riggs v. Tayloe, 9 Wheat., [22 U. S.] 483.

There is no evidence properly before me, showing that there was any valid manifest on board the schooner during this voyage, and I should be fully justified in condemning this property on this account; but waiving this objection, and conceding that these goods were entered on a manifest of some kind either at Eastport, or after leaving that port, this paper, whatever it was, is not produced in court at the hearing, but was fraudulently destroyed by the master, and I have no satisfactory evidence of its contents. Am I to presume it was a perfect and complete document in accordance with all the requirements of the statute? or from its destruction, should I not rather presume, that it would not answer the requirements of the law. "In odium spoliatoris omnia praesumuntur."

Spoliation of papers is always an aggravated and flagrant circumstance of suspicion, and whilst in prize causes, in England and this country, it does not, as on the continent, create an absolute presumption of guilt, yet in the language of Lord Stowell "a case that escapes with such a brand upon it, is saved so as by fire." But, whatever might be the presumption ordinarily, the testimony of Raymond and Young are in conflict in relation to one particular, which the statute requires should be truly stated in the manifest, and that is, the name of the consignee of the goods. Young says that the goods were consigned to Dana, and so entered upon the manifest, whilst Raymond states they were by Young's written direction entered in the name of Carlisle. It may be claimed that from the language of this witness, it is uncertain whether he intended to be understood that Carlisle appeared by the manifest to be the shipper, or consignee, but this is not of any great consequence for according to the testimony of Young, Carlisle was not the shipper, and had no interest in the goods; and the form prescribed by the act requires that the manifest shall state by whom the goods are shipped. Again, this vessel, being bound from Eastport on a foreign voyage, should have cleared for her port of destination after delivering to the collector a manifest of all her cargo. This is required by the 93d section of act of 1799, [1 Stat. 698,] and by the 23d section of the same act, [1 Stat. 644,] it is provided, that if any part of the outward cargo is brought back, the manifest at the port of arrival shall state, by whom shipped outward, and to whom consigned inward. Of course no manifest, which was ever designed to be presented to the customs officers at the port of arrival of this schooner, would have shown that these goods had been transported to a foreign country, or that she had touched at any foreign port after leaving Eastport.

By the 24th section of the statute of 1799, [1 Stat. 646,] it is enacted, that if any goods, wares or merchandise shall be imported or

brought into the United States in any ship or vessel whatever, belonging in whole or in part to a citizen of the United States, from any foreign port or place without having a manifest or manifests on board agreeably to the directions in the foregoing section, or which shall not be included or described therein, or shall not agree therewith, in every such case, the master or other person having charge, &c., shall forfeit and pay a sum of money equal to the value of such goods not included in the manifest, and all such merchandise, not included in the manifest, belonging or consigned to the master, mate, officers or crew of such vessel, shall be forfeited. The claimant was one of the officers or crew of the Ariel; there was an importation of the goods in question from a foreign port; the vessel is found with the goods on board without a manifest; and I think I am justified in concluding that if there ever was any manifest, it was not one which would answer the requirements of the law, and that the property in question is therefore liable to forfeiture.

It seems to me, that under another view of the provisions of the act of 1799, this property is also liable to forfeiture. The 25th section of that act [1 Stat. 646] requires, that the manifest described in the 23d and 24th sections [1 Stat. 644–646] shall be produced by the master to the boarding officers of the customs on his arrival within four leagues of the coast, and shall also be produced to the officers of the customs, who shall first come on board upon the arrival of the vessel within the limits of any district in which any part of the cargo is to be landed. He shall also deliver to each of these boarding officers true copies of this manifest, and they shall certify on the back of the original manifest to its being so produced to them, and the master shall produce and deliver to the collector his original manifest so certified. The manifest, it appears. should thus be made out before the vessel arrives within four leagues of the coast, and must be on board at the time of the importation. and remain and continue on board until produced to the collector. It is not enough for the claimant to show that a manifest was on board at the time when the vessel arrived within four leagues of the coast, or when she arrived at the port of destination, and that five minutes afterwards it was fraudulently destroyed by the master. The original document is demanded by the law. It has its own work to accomplish. It is to manifest the truth and the facts, and to continue on board, so manifesting them, from the time the vessel is within four leagues of the coast; from that moment to be always in readiness to testify and declare the truth to the different boarding officers, and finally to rest in the custom house, there to remain as part of the public documents of the department. And this re-

sult is confirmed by the proviso of section 24, which enacts, that if it shall be made to appear to the satisfaction of the collector, or to the satisfaction of the court in which a trial shall be had concerning such forfeitures, that no part of the cargo of such ship or vessel had been unshipped after it was taken on board, except such as shall have been particularly specified and accounted for in the report of the master or other person having charge or command of such ship or vessel, and that the manifests have been lost or mislaid without fraud or collusion, or that the same were defaced by accident, or incorrect by mistake, in any such case, the forfeiture aforesaid shall not be incurred.

If the manifest is not produced, I am of opinion that the forfeiture attaches to the importation, unless its non-production is accounted for to the satisfaction of the court. within the terms of this proviso; as in the present case, I believe the manifest was fraudulently destroyed by the master, and as a portion of the cargo had also been discharged without being specified in any report of the master, this claimant cannot derive any benefit from this proviso, but on the contrary is rather concluded by it. I am therefore of opinion that all the property in question which was found on board this schooner, is liable to forfeiture under the second count in this libel.

The last count is founded on the act of 27th of May, 1848, [9 Stat. 232,] in connection with the act of 1866, c. 201, § 4, [14 Stat. 179.] By the former act, registered vessels, trading between one port in the United States and one or more ports in the same, are allowed to touch at foreign ports and take on merchandise, &c., provided they are furnished by the collector of the port in which they take in their cargo in the United States, with a certified manifest of their cargo. In the present case, there is no evidence of any such manifest having been obtained at Eastport; and as the announcement to the collector at Eastport that they were bound to Head harbor, and a request for a certified manifest, would at once have excited his suspicions, and defeated their purpose in going there, I cannot believe that any such certified manifest was obtained there, although, from the omission of the government and claimant to procure any evidence touching this point from the files of the custom house at Eastport, the court has not been furnished with that certain and positive testimony, which it was in the power of either party to have produced. By the 48th section of the act of 1799, it is made requisite that merchandise of the growth, product or manufacture of the United States, if exported to a foreign country, should be cleared out, on its original exportation from the United States; if not so cleared out, and it is taken to a foreign place and reimported from thence, it is subject to duty. In the present case, there is no pretence of

a clearance of these goods from Eastport to any foreign port, and if brought from such foreign port and liable to duty, the manifest should certainly show the true state of the case in regard to them, and it was fraudulent on the part of the claimant to attempt to import them as coming directly from Eastport, and so not subject to duty.

The 4th section of the act 1866, c. 201. [14 Stat. 179,] declares that if any person shall fraudulently or knowingly import or bring into the United States. any goods, wares or merchandise, contrary to law, the same shall be forfeited. These goods were carried from Eastport to a foreign place, Head harbor, without a clearance or certified manifest, and are brought here from this foreign port without the certified manifest required by the act of 1848, or the manifest described in the act of 1799, and under the fraudulent pretext of being brought here directly from a home port. Raymond and Young were both of them experienced ship-masters, conversant with the revenue laws, practiced in the violation of their provisions, and I think I am justified under all the circumstances, in finding that these goods were imported and brought by them into this port fraudulently and knowingly in violation of law, and therefore subject to forfeiture.

Obeying the instructions of the supreme court as declared in U. S. v. Taylor, [Taylor v. U. S.,] 3 How. [44 U. S.] 197, that "revenue laws ought to be so construed. as most effectually to accomplish the intentions of the legislature in passing them. instead of being construed with great strictness in favor of defendant," I do pronounce. declare and decree. that the property here claimed by Thomas G. Young, which was seized on board the Ariel to wit: 16 barrels cod-liver-oil, 10 M. lathes. 2,000 lbs. dry fish. 424 boxes of herring, be forfeited to the United States of America. and that the remainder of this property. although equally liable to condemnation. having been seized on land, is not subject to condemnation in the present proceeding.